# Exhibit C

CONFIDENTIAL - ATTORNEY'S EYES ONLY

Page 1

1    UNITED STATES DISTRICT COURT
2    NORTHERN DISTRICT OF CALIFORNIA
3    ---oOo---
4    THRESHOLD ENTERPRISES LTD, a
     Delaware corporation,
5
            Plaintiff,
6
     vs.                                     No. 5:22-cv-06483-PCP
7
     LIFEFORCE DIGITAL INC., a
8    Delaware corporation,
9           Defendant.
     _____/
10
11
12
13          Confidential - Attorney's Eyes Only
14             DEPOSITION OF BRIAN CAYTON
15
16
17
18          Taken before Kaylin Hoag
19              CSR No. 14267
20            December 13, 2023
21
22
23
24
25

CONFIDENTIAL - ATTORNEY'S EYES ONLY

---

Page 2

```
 1                I N D E X
 2                              PAGE
 3  EXAMINATION BY MR. SPATZ        5, 132, 138
 4  EXAMINATION BY MR. AGARWAL      126, 137
 5
 6
 7            E X H I B I T S
 8                              PAGE
 9  DEFENDANTS'
10  Exhibit 200   Threshold marketing kit      19
11  Exhibit 201   Threshold April 2022
                  Newsletter                   32
12
    Exhibit 202   Threshold Quarterly Catalog
13                Spring 2023                  45
14  Exhibit 203   Customer List and Type       58
15  Exhibit 204   Customer List and Type
                  No Blocking                  78
16
    Exhibit 205   Sourcenaturals.com home page 81
17
    Exhibit 206   Source Naturals Amazon
18                storefront                   84
19  Exhibit 207   Source Naturals Amazon
                  storefront top sellers page  85
20
    Exhibit 208   Source Naturals Shopify
21                website                      86
22  Exhibit 209   Life Force Multiple product
                  page on Source Naturals Shopify 86
23
    Exhibit 210   Life Force Multiple product
24                page on Amazon               87
25
```

---

Page 3

```
 1  Exhibit 211   Life Force Green Multiple
                  product page on Amazon       87
 2
    Exhibit 212   Life Force Multiple product
 3                page on iHerb                88
 4  Exhibit 213   Source Naturals Awards and
                  Distinctions                 96
 5
    Exhibit 214   October 9, 2003 e-mail
 6                correspondence              105
 7  Exhibit 215   Life Force radio spot script 106
 8  Exhibit 216   Life Force TV spot script    107
 9  Exhibit 217*  Faxed letters               109
10
11
12            *Exhibit not received by reporter.
13
...
25
```

---

Page 4

```
 1            DEPOSITION OF BRIAN CAYTON
 2
 3
 4        BE IT REMEMBERED, that pursuant to Notice, and on
 5  the 13th day of December 2023, commencing at the hour of
 6  9:27 a.m., in the offices of Regus, 2033 Gateway
 7  Boulevard, 6th Floor, San Jose, California, before me,
 8  KAYLIN HOAG, a Certified Shorthand Reporter, State of
 9  California, personally appeared BRIAN CAYTON, produced as
10  a witness in said action, and being by me first duly
11  sworn, was thereupon examined as a witness in said cause.
12                    ---oOo---
13  APPEARANCES
14  For the Plaintiff:
15        MONTY AGARWAL
          Vallejo Antolin Agarwal Kanter LLP
16        3021 Citrus Circle, Suite 220
          Walnut Creek, California 94598
17        (925) 951-6970
          magarwal@vaakllp.com
18
    For the Defendant:
19
          GEORGE SPATZ (pro hac vice)
20        MANON BURNS
          Amin Talati Wasserman, LLP
21        549 W Randolph Street, Suite 400
          Chicago, Illinois 60661
22        (312) 466-1033
          gspatz@amintalati.com
23        manon@amintalati.com
24
25
```

---

Page 5

```
 1                 BRIAN CAYTON
 2             sworn as a witness
 3             testified as follows:
 4
 5  EXAMINATION BY MR. SPATZ:
 6      Q.  Could you please state and spell your name for
 7  the record?
 8      A.  Brian Cayton; B-R-I-A-N, C-A-Y-T-O-N.
 9      Q.  I mean, do you have a preference if I call you
10  Brian or Mr. Cayton?
11      A.  Brian.
12      Q.  Brian, okay.  I will try to do that.
13      A.  Either one.  I'll answer.
14      Q.  Have you ever been deposed before?
15      A.  I believe so.
16      Q.  How many times?
17      A.  Twice.
18      Q.  Okay.  Do you recall what the nature of the
19  deposition was?
20      A.  I really have to dig.  Monty was -- I'm sure
21  it's related to Threshold business at some point.
22      Q.  Okay.  And was that some time ago?
23      A.  Yeah.
24      Q.  Okay. Well, just to make sure we're on the same
25  page, I'll just go through, you know, just of a few of
```

Page 6

1  the ground rules.  I'm sure you've covered it, but I want
2  to make sure we're on the same page.
3         First of all, we have a court reporter here.  So
4  it's important that we both speak clearly and slowly so
5  she can record all our words.  Likewise, we shouldn't
6  talk over each other.  So I will do my best to let you
7  finish before I start, and if you can let me finish
8  before you start answering, I'd appreciate that.  Is that
9  okay?
10     A.  Yes.
11     Q.  Okay.  That's great that you said yes.  The
12  other thing is it's very hard for her to record nods of
13  the head, shakes of the head.  So we can have the verbal
14  yes or no, that would be appreciated.  Okay?
15     A.  Yes.
16     Q.  Your lawyer may object to one of my questions.
17  Unless he instructs you not to answer, even after the
18  objection, you still will give an answer.  Okay?
19     A.  Yes.
20     Q.  Okay.  And then this is not a marathon or a, you
21  know, particular hardship.  So if you need a break for
22  any reason, if you need to use the restroom, you know,
23  get more water, if you just need to stand up and stretch
24  your legs for ten seconds, let me know.  I'll finish
25  whatever question or whatever line of questions I'm on

Page 7

1  and we can take a break.  Okay?
2     A.  Thank you.
3     Q.  Is there any reason you would not be able to
4  give truthful testimony today?
5     A.  No.
6     Q.  You're not on any medication or any other reason
7  that would impair your ability to give truthful
8  testimony?
9     A.  No.
10     Q.  Okay.
11         Without revealing any substance of conversations
12  with your counsel, what did you do to prepare for today's
13  deposition?
14     A.  Not a lot.  Talked to counsel.
15     Q.  And about how long did you meet with counsel?
16     A.  I didn't -- well, we just met for --
17     Q.  Before coming in here?
18     A.  -- a couple of minutes.  I talked to him on the
19  phone coming in here, and we spoke at least once over the
20  last couple -- over the last few days.
21     Q.  Did you speak to anybody else at Threshold
22  regarding your deposition testimony today?
23     A.  No other than on the phone call with
24  Mr. Agarwal.
25     Q.  And you understand the testimony you're giving

Page 8

1  today is in connection with a case that Threshold
2  Enterprises has brought against Lifeforce Digital, Inc.,
3  for generally speaking trademark infringement?
4     A.  Yes.
5     Q.  Can you give a brief background of your
6  educational experience with the highest level achieved?
7     A.  I got my BS at Cornell University, and I got my
8  JD at University of Santa Clara Law.
9     Q.  What was your major in at Cornell?
10     A.  I was in the school of industrial labor
11  relations.  So that's personnel management and labor law,
12  labor law legislation.
13     Q.  And did you go straight into law school after
14  undergraduate?
15     A.  I did not.
16     Q.  So what did you do after -- and what year did
17  you graduate undergraduate?
18     A.  I graduated 1976.
19     Q.  So following your undergraduate, what did you
20  do?
21     A.  I found my way to California and found my way to
22  Boulder Creek to visit my college housemates and ended up
23  never leaving Santa Cruz County.
24     Q.  And did you find employment?
25     A.  Yes.  I found employment and I worked for three

Page 9

1  and a half years in sales and then went to law school in
2  1980.
3     Q.  And do you know what company you were in sales
4  for?
5     A.  Yes.
6     Q.  What was that company?
7     A.  The name was Xerographic Copy Systems with an X.
8     Q.  And you sold copy systems?
9     A.  We basically sold office supplies, toner for
10  copy machines.  That was kind of a boiler room.
11     Q.  Okay.  And then you went to law school.  So that
12  would be 1980 to 1983?
13     A.  Exactly.
14     Q.  Okay.  And after law school what did you do?
15     A.  I went into practice of law in Santa Cruz with
16  an experienced lawyer named Gary Britton, B-R-I-T-T-O-N,
17  and we became the law firm of Britton & Cayton.  And he
18  was basically retiring and turning his business over to
19  me, and I did that for about three and a half years.  I
20  guess, should I just continue on?
21     Q.  No, no.  That's fine.
22         MR. AGARWAL:  Let him ask.
23  BY MR. SPATZ:
24     Q.  And at the law firm did you focus on any
25  particular area of law?

Page 10

1  A. I would say family law and general business law.
2  Q. Okay. So three and a half years would be around
3  '86/'87?
4  A. Yes.
5  Q. Okay. And then --
6  A. Early '87.
7  Q. And then what did you do after --
8  A. I left. I was basically a solo practitioner at
9  that point and didn't want to be solo, wanted to work
10 with other people. And I went into practice with a --
11 with a law firm called Baskin & Grant, B-A-S-K-I-N and
12 Grant. I think we had five attorneys. I might've been
13 the fifth attorney.
14  Q. And then, again, did you focus on any particular
15 area?
16  A. Business and real estate law.
17  Q. And how long were you at, I'm sorry, Baskin
18 and...
19  A. I would say another three and a half or so
20 years. I left in around November of '91. Is that right?
21 November of '90? November of '90.
22  Q. And following that practice what did you do?
23  A. After having some time off, I came to work at
24 Threshold Enterprises in and around at the end of May of
25 1991.

Page 11

1  Q. And have you been at Threshold uninterrupted
2 since then?
3  A. No.
4  Q. Okay. So starting in May 1991, what were you
5 hired to do at Threshold?
6  A. Sales.
7  Q. And how long were you in the sales position?
8  A. I was a salesperson for about nine months, and
9 then I was elevated to national sales manager.
10  Q. And as national sales manager, what was the
11 scope of your responsibilities?
12  A. I was in charge of the sales team.
13  Q. And how long were you in this position then of
14 national sales manager?
15  A. Until I think it was May of 2005.
16  Q. And in the role as national sales manager, did
17 you have any other responsibilities other than the sales
18 team? Did you have responsibilities in marketing or in,
19 you know, product development, anything of that nature?
20  A. Not responsibilities, no. I was involved in
21 that. You know, being in sales you are interested in
22 marketing and product development, but I wasn't
23 responsible for that.
24  Q. And who did you report to during that time
25 period?

Page 12

1  A. Ira Goldberg, B-E-R-G.
2  Q. And how many people reported to you?
3  A. Initially or eventually or...
4  Q. Kind of in that time period of I guess it would
5 be '92 to 2005.
6  A. 14 years. We grew a lot. So I would say when I
7 left in 2005, there might've been about 50 people that
8 would be underneath me.
9  Q. And then when you started in 1991?
10  A. 20.
11  Q. Okay. And then after May of 2005, what did you
12 do?
13  A. I worked for a couple of different companies.
14 I...
15  Q. What companies did you work for?
16  A. They were kind of consulting roles. One was
17 called Farmers Express. They were brokers of fruit. I
18 think it was mostly fruit. And I worked with them for a
19 bit. Another company was called I think it's Larse
20 Farms. L-A-R-S-E, Larse Farms and he was a strawberry
21 grower and I consulted with him. And the third company I
22 worked for was a startup called Aardvark Adventures and
23 this was a company that created children's books that you
24 could put your children's picture in, create your own
25 book. And I was technically the -- I think it was the

Page 13

1 COO of that company, a startup and didn't last very long.
2  Q. Okay. And then after these consulting roles,
3 you told me a little bit about -- you told me a little
4 bit about the Aardvark Adventures having operational
5 responsibilities. In the earlier two, for the two farms,
6 was that sales consulting or kind of what was your scope
7 of consulting?
8  A. Well, let's see. For Farmers Fruit I kind of
9 helped them set up their offices, HR stuff, employment
10 stuff, hiring. It was a small company and just helping
11 in various ways using, you know, my business and legal
12 backgrounds.
13  Q. Okay. And then how long were you in these
14 various consulting roles?
15  A. The whole period of time. From the time I left
16 Threshold, then I came back to Threshold as an
17 independent contractor was May 2005 to February 2008.
18  Q. Was there any particular reason why you left
19 Threshold?
20  A. A lot of reasons.
21  Q. Is there a primary reason?
22  A. Needed a change.
23  Q. And then when you came back in 2008, you said
24 you were an independent contractor?
25  A. (Nonverbal response.)

4 (Pages 10 - 13)

Page 14

1  Q. And what was your role when you came back?
2  A. I was hired to help them achieve compliance with
3  the new GMP regulations.
4  Q. And how long were you in that position?
5  A. Until I became an employee in I'm going to guess
6  May of 2011. It was in 2011. I don't know the exact
7  month though.
8  Q. When you became an employee, what was your role
9  at that point?
10  A. My role was to continue with the GMP project and
11  I started taking on other strategic initiatives for the
12  company and was being involved in the core management
13  group of the company.
14  Q. Can you give me example of a strategic
15  initiative?
16  A. Opening up a new warehouse on the east coast.
17  Q. And who were you reporting to at that time?
18  A. Ira Goldberg.
19  Q. And did you have direct reports while you were
20  in compliance?
21  A. No. I worked with people, but I did not
22  supervise anybody.
23  Q. How long were you in the compliance role as an
24  employee?
25  A. I'm still an employee.

Page 15

1  Q. And you're still in the compliance role?
2  A. Well, that's one of the roles. My title is
3  director of corporate development. I made it up. It
4  just allows me to be involved in various initiatives,
5  projects.
6  Q. And do you know when you took on the title of
7  director of corporate development?
8  A. When I became an employee --
9  Q. Okay.
10  A. -- in 2011.
11  Q. And do you still have sales responsibility?
12  A. No. I have sales involvement but not sales
13  responsibility.
14  Q. And what's the scope of your sales involvement?
15  A. In meetings with the sales management team and
16  being available. You know, my experience in the company
17  and knowledge is sometimes asked for.
18  Q. And who -- who heads the sales management team?
19  A. The director of sales is Johnny Sanchez.
20  Q. And do you still report to Ira Goldberg?
21  A. I do.
22  Q. And who's Carl Weissman?
23  A. He is our CFO/COO.
24  Q. Do you have a reporting relationship with him?
25  A. I do not. When you say reporting, you mean do I

Page 16

1  report -- is he my boss?
2  Q. Yes.
3  A. Ira Goldberg is my boss.
4  Q. Do you work with Ryan Encinas? That's
5  E-N-C-I-N-A-S.
6  A. Marginally. He's in some meetings that I'm in.
7  Q. And do you know the scope of his
8  responsibilities?
9  A. I believe his title might be marketing director.
10  Q. And is Ira Goldberg involved in the day-to-day
11  operations of the company at this point?
12  A. Yes.
13  Q. And what role does Barry Sugarman have in the
14  company?
15  A. He's involved in a lot of initiatives too.
16  Q. Do you know if he has a scope of responsibility
17  for the company?
18  A. When you say responsibility, I mean, I could
19  think of involvement. I don't know the difference
20  between responsibility and -- when you say
21  responsibility, you mean like that he's in charge as
22  opposed to...
23  Q. Yes. Is he in charge of any functions, for
24  example, sales or marketing or regulatory?
25  A. I know you're going to see him tomorrow. So

Page 17

1  you're going to ask him whether he feels he's in charge
2  or not. I would say he's involved in at lot of things, a
3  lot of areas in the company.
4  Q. Got it. And Brody Heinrich, H-E-I-N-R-I-C-H,
5  what is his responsibility?
6  A. He's no longer with us. He is our former
7  director of sales.
8  Q. And did Johnny Sanchez replace him?
9  A. Eventually. I think there was -- there was a
10  gap.
11  Q. In law school or in any of your work experience,
12  did you have particular classes or education in trademark
13  or branding law?
14  A. No.
15  Q. In preparing for -- or strike that.
16      Were you involved in searching for and
17  collecting documents to produce in this case?
18  A. I was asked if I had any documents.
19  Q. Okay. And then did you search to see if you had
20  any documents?
21  A. I did.
22  Q. Okay. And what did you do to search for
23  documents?
24  A. Went to my files at my office.
25  Q. Okay. And are those hard copy files or like

Page 18

 1  Microsoft file explorer?
 2      A.  Hard copy files.
 3      Q.  Okay.  Do you maintain electronic files?
 4      A.  I have some, yes.
 5      Q.  Okay.  And did you look at the electronic files?
 6      A.  Yes.
 7      Q.  Okay.  And did you communicate regularly in the
 8  corporation through e-mail?
 9      A.  Now I do.
10      Q.  And did you search your e-mails?
11      A.  For what?
12      Q.  For documents.
13      A.  Only the -- did I search my e-mail for
14  documents?  I don't -- I don't recall if I did or not.  I
15  don't know.  I wasn't asked for any -- any particular
16  e-mails.
17      Q.  Okay.  And are there other methods the company
18  uses to communicate like chat or Slack or anything like
19  that?
20      A.  I think we have -- what is it?  It's on -- I'm
21  not that computer literate.  I'm sorry.
22      Q.  That's all right.
23      A.  I'm a hardcopy type of guy.
24      Q.  I was going to take it from your answer that you
25  don't regularly use?

Page 19

 1      A.  I don't but there's a chat thing when you're on
 2  -- what is it?
 3      Q.  Is it Microsoft Teams?
 4      A.  Yeah.  Yeah.  Okay.
 5      Q.  And you don't regularly use the Microsoft Teams
 6  functions?
 7      A.  I don't.
 8      Q.  Okay.  And did you work with anybody else to
 9  collect documents, somebody else's documents, or you only
10  looked for your own documents?
11      A.  No.  I didn't work with anybody else.
12      Q.  Mark this.
13          You used 1.  Should we use letters?
14          MR. AGARWAL:  Yeah, our local rules require that
15  you use a different increment.  So why don't you start at
16  200 just to be safe or 101 or something.  But I think --
17          MR. SPATZ:  It requires numbers, though, or
18  should we start with A?
19          MR. AGARWAL:  No.  You have to use consecutive
20  numbering.  So my preference is you start with 200, but
21  it's up to you.
22          MR. SPATZ:  Okay.  So 200.
23          (Defendants' Exhibit No. 200 marked
24          for Identification.)
25  ///

Page 20

 1  BY MR. SPATZ:
 2      Q.  Mr. Cayton, do you recognize this document?
 3  It's a PDF I took off the Threshold website that was
 4  identified as a marketing kit.
 5      A.  No.  I don't.
 6      Q.  I'd like to ask you a couple questions about the
 7  content in here and if you're familiar with that.
 8  Generally I want to understand Threshold's business and
 9  kind of what Threshold does.  In the second paragraph you
10  see it says that "Threshold offers more than 450 brands
11  and 18,000 products distributed through all 50 states."
12  Do you see that?
13      A.  I do.
14      Q.  Is that kind of understanding of the scope of
15  what Threshold sells?
16      A.  Yes.
17      Q.  Okay.  And primarily is that third-party brands
18  that Threshold distributes?
19      A.  Yes.
20      Q.  Okay.  And Threshold also has its own brands;
21  correct?
22      A.  Yes.
23      Q.  Okay.  And what are Threshold's own brands?
24      A.  The ones that we currently distribute are two,
25  Planetary Herbals and Source Naturals.

Page 21

 1      Q.  And in the past did Threshold have more of its
 2  own brands?
 3      A.  Yes.
 4      Q.  How long ago?
 5      A.  Since the time I started.
 6      Q.  Okay.  And was it several additional brands or
 7  one or two additional brands?
 8      A.  A couple of house brands.
 9      Q.  Do you recall what those were?
10      A.  Yes.
11      Q.  Could you let me know?
12      A.  Yes.  One was called Horizon and maybe
13  eventually it was called Horizon Nutraceuticals possibly.
14  One was Chi Power.  Those are the ones that come to mind.
15      Q.  Okay.  And do you know how long ago Threshold
16  stopped selling Horizon?
17      A.  We still might have it and use it for certain
18  purposes.  Horizon was like a mass market brand.  I can't
19  say that we're not using it.  I'm not aware that we are.
20  I know we're not using the Chi Power anymore.
21      Q.  And when did Threshold stop the Chi Power
22  product?
23      A.  I don't know, 15 years ago or more or so.
24      Q.  One of the things it mentions here in this
25  document is educational based marketing.  Are you

CONFIDENTIAL - ATTORNEY'S EYES ONLY



Page 90

20　　　MR. AGARWAL: Object to the form -- sorry, did
21　you finish?
22　　　MR. SPATZ: Yes.
23　　　MR. AGARWAL: Object to the form of the
24　question. I'm not sure it is a question.
25　　　MR. SPATZ: I wasn't a question.

Page 91

1　　　MR. AGARWAL: That's why I was asking if you
2　were finished with the question. But I object to the
3　characterization of prior testimony, but go ahead.
4　　　MR. SPATZ: Fair enough.

24 (Pages 90 - 93)

Page 94

[redacted]

5  Q. Are you familiar with Threshold's customer
6  service operations?
7  A. To a certain extent, yes.
8  Q. Okay. Do you know if the customer service team
9  keeps records of customer inquiries or complaints
10 regarding products?
11 A. Complaints, adverse reactions we should. We
12 used to and we should. But not inquires necessarily.
13 Q. Do you know what system the customer service
14 organization uses to track complaint reports?
15 A. I don't know that we have a system. I don't
16 know now or then. I thought it used to be in like an
17 Excel spreadsheet or something.
18 Q. Okay.
19    Are you aware of any instances of confusion
20 between the Life Force products and the defendant's,
21 Lifeforce Digital, Inc.'s products?
22 A. When you say confusion, what do you mean?
23 Q. Are you aware of any individuals who have
24 reported that they were confused between what product
25 they were purchasing, so between the Life Force products

Page 95

1  and the defendants -- I'm going to say LDI; is that okay?
2  -- LDI's products?
3  A. I'm not aware of any.
4  Q. Are you aware of any instances of confusions
5  between the companies Threshold and LDI?
6  A. And when you say confusion, you mean consumers'
7  confusion?
8  Q. Yes.
9  A. I'm not aware of any.
10 Q. Okay. And are you aware of any instances of
11 confusion between Threshold's commercial activities and
12 LDI's commercial activities?
13 A. Not aware of.
14 Q. Are you aware of whether there are systems at
15 Threshold that would record any reports of confusion?
16 A. Once again, you're talking about consumers'
17 confusion?
18 Q. Yes.
19 A. I don't know that we have a formal thing. I
20 don't know that anybody who would be confused would call
21 you up and tell you they're confused. So it's kind of --
22 it's an interesting thing that -- I don't know that
23 anybody would -- it would ever exist, that someone would
24 do that.
25 Q. Okay.

Page 96

1  So we limited each one of those questions to
2  consumer confusion. Are you aware of any instances of
3  confusion that you would categorize as something other
4  than consumer confusion?
5  A. Like a retailer?
6  Q. Sure.
7  A. Me, personally, no, I'm not aware of. I haven't
8  had any reports to me of confusion.
9  Q. Are you aware of or familiar with any awards or
10 recognitions given to the Source Natural product line?
11 A. I'm aware of some, yeah.
12 Q. Okay. Are you aware of awards given to the Life
13 Force product?
14 A. I know there've been some, yes.
15    (Defendants' Exhibit No. 213 marked
16    for Identification.)
17 BY MR. SPATZ:
18 Q. Brian, I've handed you what's been marked as
19 Exhibit 213. Do you recognize this as a listing of
20 awards and distinctions for the Source Naturals brand
21 from the Source Naturals website?
22 A. I didn't know that this is from the website but
23 it's a listing of awards and distinctions.
24 Q. Okay. Hold on one second. Did I give you a
25 highlighted copy?

Page 97

1  A. Yeah, you did.
2    (Off the record discussion.)
3  BY MR. SPATZ:
4  Q. And if you look on the second page of this
5  document, page 1391, do you see the March 2014 Delicious
6  Living Magazine, Source Natural Life Force Vegan, best
7  multiple honorable mention?
8  A. Yes.
9  Q. Are you aware of that award or that distinction
10 for the Life Force Vegan product?
11 A. I don't specifically remember that.
12 Q. Are you familiar with the Delicious Living
13 Magazine?
14 A. Yep.
15 Q. Do you know its target audience?
16 A. I believe Delicious Living Magazine is either
17 given away or sold in natural food stores. At least it
18 was ten years ago.
19 Q. Okay. Do you know the distribution for
20 Delicious Living Magazine?
21    MR. AGARWAL: You mean the number of
22 distribution?
23    MR. SPATZ: Yes.
24    THE WITNESS: No.
25 ///

Page 98

1  BY MR. SPATZ:
2  Q. If you look at the next page 1392, it has
3  January 2012 Source Naturals Life Force Green Multiple,
4  winner multivitamin. Do you see that?
5  A. Delicious Living? No, no, I'm sorry. Which
6  one?
7  Q. No. It's January 2012 --
8  A. Taste for Life?
9  Q. -- Taste for Life.
10  A. I see that.
11  Q. Okay. Are you familiar with that award or
12  distinction?
13  A. Not specifically.
14  Q. Are you aware of Taste for Life Essentials?
15  A. I might've been 12 years ago, but right now I
16  don't remember what it is.
17  Q. Okay. On the one directly below that,
18  September 2011 Better Nutrition Best Supplement Award for
19  Source Naturals Life Force Multiple. Do you see that?
20  A. Yes.
21  Q. Are you familiar with that award or distinction?
22  A. Yes.
23  Q. Okay. And what was that award or distinction?
24  A. Better Nutrition is a magazine and they gave us
25  an award for best supplements.

Page 99

1  Q. Yeah. Are you aware of how the Life Force
2  Multiple was identified for that award?
3  A. I don't recall.
4  Q. Do you know the distribution for Better
5  Nutrition?
6  A. Not specifically.
7  Q. Do you know the target audience for Better
8  Nutrition?
9  A. People that are interested in health.
10  Q. Okay. If you go to the next page, 1393,
11  and 2007 it has the Vitamin Retailer Vity Awards. Are
12  you familiar with the Vity Awards?
13  A. Yeah. It's pronounced Vity but...
14  Q. Vity. And what are those awards?
15  A. Vitamin Retailer is a magazine designed for
16  natural food retailers, and every year they give out
17  awards in various categories.
18  Q. Do you know what the distribution for the
19  magazine is?
20  A. As far as the number of people who get the
21  magazine?
22  Q. Yes.
23  A. No but I do know it's online too.
24  Q. Okay. And are you familiar that -- did you know
25  that Source Natural Life Force Multiple got second place

Page 100

1  for multivitamins in 2007?
2  A. Yes.
3  Q. Going down to -- skipping down to March 2005, it
4  has the Whole Foods Magazine. There's two Source Natural
5  Life Force multiples, the men's and the women's?
6  A. Yep.
7  Q. Were you aware of that award in 2005?
8  A. Yes.
9  Q. Okay. And are you familiar with what Whole
10  Foods Magazine is?
11  A. Another natural food, healthy living type
12  magazine.
13  Q. And are you familiar with the distribution?
14  A. I don't think I'm familiar with the distribution
15  of any magazine as far as how many subscribers they have.
16  Q. Okay. And then if you look up at 2006, the Lyle
17  MacWilliam's Comparative Guide to Nutritional
18  Supplements, are you familiar with that publication?
19  A. Yes.
20  Q. Okay. And Source Naturals Life Force scored a
21  hundred percent it says on -- in that publication; is
22  that correct?
23  A. Yep.
24  Q. Okay. And are -- what is the Lyle MacWilliam's
25  Comparative Guide to Nutritional Supplements?

Page 101

1  A. He came out with a printed guidebook of
2  nutritional supplements, multi -- multiple-ingredient
3  products such as Life Force and ranked them and I think
4  -- and he ranked Life Force as the number one product.
5  Q. In 2006?
6  A. Yes.
7  Q. Are you aware of any updates or further rankings
8  of the Life Force product after 2006 from Lyle
9  MacWilliam's?
10  A. Well, let's see. This says third edition. So I
11  don't know how many -- you know, I know it came out in a
12  couple of editions. So I don't know if this was the last
13  edition or the third edition, if there was more.
14  Q. Okay. And if you look at the last page,
15  page 1394, there's also the 2003 Lyle MacWilliam's
16  Comparative Guide to Nutritional Supplements?
17  A. Yes.
18  Q. Is that the original publication in which the
19  Life Force Multiple was ranked?
20  A. I couldn't know, but this says third edition too
21  strangely.
22  Q. Yeah, I'll represent to you the 2006 says third
23  edition updated.
24  A. Okay. So I don't know when the first one was.
25  Q. Following the ranking from Lyle MacWilliam's,

CONFIDENTIAL - ATTORNEY'S EYES ONLY



Page 138

Page 139

```
 1  STATE OF CALIFORNIA  )
 2                       )
 3  COUNTY OF ALAMEDA    )
 4
 5      I, KAYLIN HOAG, a Shorthand Reporter, State of
 6  California, do hereby certify:
 7      That BRIAN CAYTON, in the foregoing deposition
 8  named, was present and by me sworn as a witness in the
 9  above-entitled action at the time and place therein
10  specified;
11      That said deposition was taken before me at said
12  time and place, and was taken down in shorthand by me, a
13  Certified Shorthand Reporter of the State of California,
14  and was thereafter transcribed into typewriting, and that
15  the foregoing transcript constitutes a full, true and
16  correct report of said deposition and of the proceedings
17  that took place;
18      That before completion of the proceedings,
19  review of the transcript [ ] was [X] was not requested.
20      IN WITNESS WHEREOF, I have hereunder subscribed
21  my hand this          day of            , 24.
22
23
            KAYLIN HOAG, CSR NO. 14267
24          State of California
25
```

36 (Pages 138 - 139)